**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| MARK D. BLAU, derivatively on behalf of CHIPOTLE MEXICAN GRILL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>M. STEVEN ELLS, JOHN R. HARTUNG, ALBERT S. BALDOCCHI, NEIL W. FLANZRAICH, KIMBAL MUSK, JOHN S. CHARLESWORTH, PATRICK J. FLYNN, DARLENE J. FRIEDMAN, STEPHEN E. GILLETT, MONTGOMERY F. MORAN, and MARK CRUMPACKER<br><br>Defendants,<br><br>and<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br><br>Nominal Defendant. | Civil Action No. 1:17-cv-1836<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1. Plaintiff Mark D. Blau ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment, from February 5, 2015 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: (a) public filings made by Chipotle and other related parties and non-parties with the U.S. Securities and Exchange Commission (the "SEC"); (b) press releases and

other publications disseminated by certain of the defendants and other related non-parties; (c) news articles, shareholder communications, and postings on Chipotle's website concerning the Company's public statements; (d) publicly available filings in related securities class action lawsuits captioned *Ong v. Chipotle Mexican Grill, Inc., et al.*, Case No. 1:16-cv-00141-KPF (S.D.N.Y.) (the "*Ong* Securities Class Action") and *Kelley v. Chipotle Mexican Grill, Inc. et al.*, Case No. 1:17-cv-01760-STV (D. Colo.) (the "*Kelley* Securities Class Action"); and (e) other publicly available information concerning Chipotle and the defendants.

2. According to its public filings, Chipotle, together with its subsidiaries, develops and operates fast-casual and fresh Mexican food restaurants. As of December 31, 2016, the Company operated approximately 2,198 restaurants, including 29 Chipotle restaurants outside the U.S. and 23 restaurants in operation in other non-Chipotle concepts. Food sales are the Company's only revenue stream and the only significant source of its income, and are obviously critical to the long-term viability of the Company. Defendants were aware of this at all relevant times.

3. Between August 2015 and July 2017, the Company has endured a series of high-profile, embarrassing, and dangerous incidents which seriously call into question its food safety procedures and controls.

4. For example, during the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill. On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak. Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

5. Between August 19, 2015 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota. On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations. The affected restaurants changed tomato suppliers but did not close.

6. On or around November 1, 2015, defendants caused the Company to close all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of *E. coli* by Chipotle patrons.

7. Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts. On December 9, 2015, health officials confirmed that the students had contracted norovirus.

8. On January 6, 2016, pre-market, defendants announced that the Company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley (the "DOJ Investigation"). The investigation is being conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the Food and Drug Administration (the "FDA").

9. From the time these highly publicized, embarrassing incidents came to light until the announcement of the DOJ Investigation, the price of Chipotle stock fell significantly, from almost $750 per share in August 2015 to close at $426.67 on January 6, 2016.

10. On January 8, 2016, the Company became the subject of the *Ong* Securities Class Action in the U.S. District Court for the Southern District of New York ("New York Federal Court"). The *Ong* Securities Class Action remains pending.

11. On February 1, 2016, the Centers for Disease Control (the "CDC") published its

final report regarding Chipotle's 2015 food safety issues, which confirmed that a "common meal item or ingredient served at Chipotle Mexican Grill restaurants was a likely source of both outbreaks."

12. In the wake of Chipotle's string of food safety problems in 2015, the Company became the subject of harsh press coverage as well as satire. Most notably, TV host and comedian John Oliver ridiculed the Company over its "laundry list of" food safety problems on the February 16, 2016 episode of "Last Week Tonight."

13. In light of these incidents, on February 5, 2016, Plaintiff issued a pre-suit shareholder demand (the "Demand") pursuant to Del. Ct. Ch. R. 23.1 on the Board to undertake an independent internal investigation and to commence a civil action against each of the defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. A true and correct copy of the Demand is attached hereto as Exhibit A. The Demand stated in relevant part:

> … Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws.
>
> * * *
>
> … we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

14. On March 3, 2016, Plaintiff's counsel received a letter (the "Acknowledgement") from Thomas Blackburn, Esq. ("Blackburn") of Messner Reeves LLP ("Messner Reeves"), acting on behalf of the Board, and acknowledging receipt of the Demand. A true and correct

copy of the foregoing letter is attached hereto as Exhibit B. The Acknowledgement requested proof of Plaintiff's ownership of Chipotle stock and the date Plaintiff first acquired stock in Chipotle.

15. Despite having no obligation to do so, and unaware of any Delaware authority upon which the Company relied on to make its request, Plaintiff's counsel provided the requested information and evidence of Plaintiff's ownership of Chipotle stock via letter dated April 13, 2016. A true and correct copy of the foregoing letter is attached hereto as Exhibit C.

16. On July 21, 2016, Plaintiff's counsel received a letter from William Lafferty, Esq. ("Lafferty") at Morris, Nichols, Arsht & Tunnell, LLP ("MNAT"), which informed Plaintiff's counsel that MNAT had been retained to represent a so-called "Demand Review Committee" (the "DRC") that was authorized and empowered to consider the Demand. A true and correct copy of the July 2016 letter (the "DRC Letter") is attached hereto as Exhibit D. The DRC Letter further stated that the DRC had elected to defer any investigation into the matters raised in the Demand ***until after*** the conclusion of the DOJ Investigation ***and*** the New York Federal Court's decision on the defendants' motion to dismiss in the *Ong* Securities Class Action.

17. Importantly, under Delaware law, a board must, upon receipt of a shareholder's pre-suit demand, investigate and evaluate the charges in order to discharge its fiduciary duties to the shareholders and to manage corporate affairs responsibly. The DRC's decision to defer a consideration of the matters raised in the Demand -- serious, high-profile issues related to the Company's core operations and its only revenue stream -- would ultimately have serious consequences. On July 18, 2017, the Company announced the closure of one of its restaurants in Sterling, Virginia after 135 customers complained of illnesses following eating at the location between July 13, 2017 and July 16, 2017. As of the date of this filing, at least two of these

individuals have tested positive for norovirus.

18. The same week, reports emerged regarding a rat infestation in a Chipotle restaurant located in Dallas, Texas. Video of the incident, which was posted by a customer on Facebook, showed "one rodent scurrying across the ground, another climbing the wall and a third limp on the ground at the restaurant," according to media reports.

19. In light of these new, highly embarrassing July 2017 incidents, on July 20, 2017, the *Kelley* Securities Class Action was filed in the U.S. District Court for the District of Colorado (the "Colorado Federal Court").

20. On July 26, 2017, *The New York Times* (the "*NYT*") reported that the Company was served with ***another*** subpoena by U.S. federal prosecutors "seeking information related to a suspected norovirus outbreak at a restaurant in Sterling, Virginia that it briefly closed last week."

21. On this news, Chipotle's share price fell by $14.30 to close at $340.05 on July 26, 2017.

22. At a bare minimum, the Board was duty-bound to investigate the allegations contained in the Demand upon receipt of the Demand in February 2016. The DRC's decision to indefinitely postpone its consideration of the matters raised in the Demand (which was issued 17 months ago) represents an abdication of its duty to investigate and take action, and this failure is glaring in light of Chipotle's most recent, high-profile food safety incidents. In light of the foregoing, the Board's refusal to act on the Demand is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and prosecute this action derivatively on behalf of the Company.

23. Throughout the Relevant Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically,

defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations; (ii) Chipotle's quality controls were inadequate to safeguard consumer and employee health; and (iii) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

24. Accordingly, as a result of defendants' breaches as set forth herein, the Company has been damaged.

**JURISDICTION AND VENUE**

25. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

26. This Court has personal jurisdiction over each of the Defendants because each is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. Moreover, one or more of the Defendants either reside in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

**THE PARTIES**

28. Plaintiff is a current shareholder of Chipotle and has continuously owned Chipotle common stock since January 2015. Plaintiff is a citizen of Connecticut.

29. Nominal defendant Chipotle is a Delaware corporation with its principal executive offices at 1401 Wynkoop Street, Suite 500, Denver, Colorado.

30. Defendant M. Steven Ells ("Ells") is the founder of the Company and currently serves as the Company's Chairman of the Board and Chief Executive Officer ("CEO"). Upon information and belief, defendant Ells is a citizen of New York.

31. Defendant John R. Hartung ("Hartung") has served as the Company's Chief Financial Officer ("CFO") since 2002 and as its Principal Accounting Officer since September 2010. Upon information and belief, defendant Hartung is a citizen of Illinois.

32. Defendants Albert S. Baldocchi ("Baldocchi") has served as a director of the Company since 1997. In addition, defendant Baldocchi served as the chairman of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. Upon information and belief, defendant Baldocchi is a citizen of Colorado.

33. Defendants Neil W. Flanzraich ("Flanzraich") has served as a director of the Company since 2007. In addition, defendant Flanzraich previously served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Flanzraich is a citizen of Florida.

34. Defendant Kimbal Musk ("Musk") has served as a director of the Company since 2013. Upon information and belief, defendant Musk is a citizen of Colorado.

35. Defendant John S. Charlesworth ("Charlesworth") served as a director of the Company from 1999 until May 2017. In addition, defendant Charlesworth previously served as

a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Charlesworth is a citizen of North Carolina.

36. Defendant Patrick J. Flynn ("Flynn") served as a director of the Company from 1998 until May 2017. Upon information and belief, defendant Flynn is a citizen of Florida.

37. Defendant Darlene J. Friedman ("Friedman") served as a director of the Company from 1995 until May 2017. Upon information and belief, defendant Friedman is a citizen of California.

38. Defendant Stephen E. Gillett ("Gillett") served as a director of the Company from March 2015 until May 2017. In addition, defendant Gillett previously served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Gillett ls is a citizen of California.

39. Defendant Montgomery (Monty) F. Moran ("Moran") served as the Company's Co-CEO and Secretary from January 2009 until December 2016. Previously, defendant Moran served as the Company's President and Chief Operating Officer from March 2005 until January 2009. Prior to March 2005, defendant Moran served as CEO of the Denver law firm Messner Reeves, where he was employed since 1996, and as general counsel of Chipotle. Upon information and belief, defendant Moran is a citizen of Colorado.

40. Defendant Mark Crumpacker ("Crumpacker") has served as the Company's Chief Marketing Officer since January 2009 and as Chief Development Officer since October 2013. In March 2015, his title was changed to Chief Creative and Development Officer. Upon information and belief, defendant Crumpacker is a citizen of Colorado.

41. Collectively, defendants Ells, Hartung, Baldocchi, Flanzraich, Musk, Charlesworth, Flynn, Friedman, Gillett, Moran and Crumpacker shall be referred to herein as

"Defendants."

42. Collectively, defendants Baldocchi, Flanzraich, Charlesworth and Gillett shall be referred to herein as "Audit Committee Defendants."

**DEFENDANTS' DUTIES**

43. By reason of their positions as officers, directors, and/or fiduciaries of Chipotle and because of their ability to control the business and corporate affairs of Chipotle, Defendants owed Chipotle and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chipotle in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Chipotle and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Chipotle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44. Defendants, because of their positions of control and authority as directors, officers and/or control person of Chipotle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chipotle, each of the Defendants had knowledge of material non-public information regarding the Company.

45. To discharge their duties, the Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Defendants were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it

possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

46. The Company also maintains a Code of Conduct (the "Code") for "all employees, Officers, and all members of the Board of Directors." The Code is intended to "guide ethical behavior." In critical part, the Code describes the methods by which those covered by the Code should communicate with the public:

> **Communicating with the Public**
> Whenever Chipotle communicates with the public, including the media and government agencies, accuracy and thoroughness are critical. In general, only Officers or the Director of Communications are authorized to make or approve public statements made on behalf of Chipotle. Public statements should be sufficiently candid, clear, and complete so that they neither mislead nor lend themselves to misinterpretation. To ensure that accurate and appropriate information is relayed to the public, all public statements made on behalf of Chipotle or our business must be made in accordance with the 'Regulation FD External Communication Policy,' or if not subject to that policy, must first be reviewed by the Director of Communications. This applies to all public statements made on behalf of Chipotle, including those made on internet bulletin boards and chat rooms. Likewise, you are requested to refer any requests for information about Chipotle to an Officer or the Director of Communications.

47. Further, the Company maintains a specific Director Code of Conduct, which details the duties of the Company's directors and states in pertinent part:

> **DIRECTOR RESPONSIBILITY**
>
> No code of ethics will be effective in the absence of the right "tone at the top." The Company expects the members of its Board of Directors at all times to set the right tone by being mindful of their obligations as fiduciaries and by adhering to high standards of conduct, including the policies set out in this Code. Directors should seek to promote those standards in fulfilling their responsibilities to the

> Company and its shareholders. Like our employees, directors are expected to act honestly, in compliance with law and in the best interests of the Company. They must conduct themselves in a professional and respectful manner and act in good faith and with due care. In their oversight of management, ***directors should be vigorous in their inquiries*** and exercise independent judgment to promote the interests of the Company. Directors are also expected to maintain the confidentiality of Company information and to disclose any possible conflicts of interest that they may have with respect to matters being considered by the Board.
>
> Any director who has concerns about compliance with the Code should direct his or her inquiry to the Chairman of the Nominating and Corporate Governance Committee or to the Company's chief legal officer.

(Emphasis added).

48. Additionally, the Audit Committee Defendants are subject to the responsibilities imposed on them by the Company's Audit Committee Charter. The Audit Committee Charter provides that the Audit Committee Defendants are obligated, among other things, to:

a. Review with management the Company's disclosure controls and procedures and review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them;

b. Review periodically, but not less frequently than annually, with management, the implementation and effectiveness of the Company's compliance and ethics program, including any concerns over compliance with the Company's Code of Business Conduct and Ethics or other applicable law or listing standards;

c. Review with management the financial information to be included in the Company's Annual Report on Form 10-K, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," ("MD&A") their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments made in the preparation of the financial statements and the clarity of the disclosures therein;

d. Review and discuss with management and the independent auditors the quarterly financial information to be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under MD&A; and

e. Review with management and the independent auditors the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting, including (i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting; (ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and (iii) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

49. According to its public filings, Chipotle, together with its subsidiaries, develops and operates fast-casual and fresh Mexican food restaurants. As of December 31, 2016, it operated approximately 2,198 restaurants, including 29 Chipotle restaurants outside the U.S. and 23 restaurants in operation in other non-Chipotle concepts. Fast food sales are the Company's only revenue stream and the only significant source of its income, and obviously are critical to the long-term viability of the Company. Defendants were aware of this at all relevant times.

50. Chipotle was founded in 1993 and is headquartered in Denver, Colorado. Chipotle's shares trade on the New York Stock Exchange under the ticker symbol "CMG."

51. The financial success of the Company, and its reputation generally, has rested on its ability to serve fresh food quickly. Defendant Ells described the Company's success to date in a December 12, 2016 conference call with analysts:

> When I opened the first Chipotle 23 years ago, potential customers would walk in expecting what they normally saw in a typical fast food restaurant. They didn't understand the open kitchen or the line where they created their own order. So they would turn and walk out. I'd have to literally chase them down the sidewalk and offer to buy their lunch. Chipotle was something entirely new. ***We broke the rules of fast food by serving fresh food prepared for hour and hours by hand,***

> ***but served very quickly.*** Over the years people became comfortable with that and what we were doing. In fact they became obsessed. Chipotle became successful beyond my wildest dreams, and I'm incredibly grateful to everyone who has been a part of that.

52. As a result of this business plan, Defendants ***knew*** that attempts to serve the freshest food, a core element of the Company's brand and strategy, came with risks. The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission ("SEC") February 4, 2015 noted the potential risks the Company faced as a result of food-borne illnesses:

> ***Instances of food-borne or localized illnesses could cause the temporary closure of some restaurants or result in negative publicity, thereby resulting in a decline in our sales, and could adversely affect the price and availability of the meat, produce or dairy we use to prepare our food.***
>
> Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could result in negative publicity about us or the restaurant industry that adversely affects our sales. ***We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.*** The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control.
>
> ***On a small number of occasions one or more Chipotle restaurants have been associated with customer illness, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness. If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants, further impacting sales***. In addition, reports linking nationwide or regional outbreaks of food-borne illnesses have caused us to temporarily suspend serving some produce items in our foods or to otherwise alter our menu. Similarly, past outbreaks of E. coli relating to certain food items caused consumers to avoid certain products and restaurant chains, Asian and European countries have experienced outbreaks of avian flu, and incidents of "mad cow" disease have occurred in Canadian and U.S. cattle herds. These problems, other food-borne illnesses (such as hepatitis A or norovirus) and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or

> negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would adversely impact our restaurant sales and profitability. Furthermore, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient costs resulting from supply problems associated with outbreaks of food-borne illnesses, which would also have a negative impact on our sales and profitability.

(Emphasis added)

**B. <u>Defendants' False and Misleading Statements</u>**

53. On February 4, 2015, Defendants caused the Company to file its annual report on form 10-K with the SEC for the quarter and year ended December 31, 2014 (the "2014 10-K"), signed by defendants Ellis, Moran, Hartung, Baldocchi, Charlesworth, Flanzraich, Flynn, Friedman, and Musk. For the quarter, the Company reported net income of $121.23 million, or $3.84 per diluted share, on revenue of $1.07 billion, compared to net income of $79.62 million, or $2.53 per diluted share, on revenue of $844.15 million for the same period in the prior year. For 2014, the Company reported net income of $445.37 million, or $14.13 per diluted share, on revenue of $4.11 billion, compared to net income of $327.44 million, or $10.47 per diluted share, on revenue of $3.21 billion for 2013. The 2014 10-K stated, in relevant part:

> ***We use high-quality raw ingredients***, classic cooking methods and distinctive interior design, and have friendly people to take care of each customer—features that are more frequently found in the world of fine dining. Our approach is also guided by our belief in an idea we call "Food With Integrity." ***Our objective is to find the highest quality ingredients we can***—ingredients that are grown or raised with respect for the environment, animals, and people who grow or raise the food.
>
> * * *
>
> ***On a small number of occasions one or more Chipotle restaurants have been associated with customer illness***, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness. If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants, further impacting sales.

* * *

> *Food With Integrity*. Serving high quality food while still charging reasonable prices is critical to our vision to change the way people think about and eat fast food. As part of our Food With Integrity philosophy, ***we believe that purchasing fresh ingredients and preparing them by hand are not enough, so we spend time on farms and in the field to understand where our food comes from and how it is raised. Because our menu is so focused, we can concentrate on the sources of each ingredient, and this has become a cornerstone of our continuous effort to improve our food***.

* * *

> *Importance of Methods and Culture*. Although we have many restaurants, we believe that our departure from the automated cooking techniques and microwaves used by many traditional fast-food and fast-casual restaurants helps to set us apart. ***Our crews use classic cooking methods: they marinate and grill meats, hand-cut produce and herbs, make fresh salsa and guacamole, and cook rice in small batches throughout the day. They work in kitchens that more closely resemble those of high-end restaurants than they do a typical fast-food place***. Despite our more labor-intensive method of food preparation, our focused menu creates efficiencies which allow us to serve high quality food made from ingredients typically found in fine dining restaurants.

* * *

> *Close Relationships with Suppliers*. ***Maintaining the high levels of quality we expect in our restaurants depends in part on our ability to acquire high-quality, fresh ingredients and other necessary supplies that meet our specifications from reliable suppliers***. Our 22 independently owned and operated regional distribution centers purchase from various suppliers we carefully select based on quality and their understanding of our mission, and we seek to develop mutually beneficial long-term relationships with suppliers. We work closely with our suppliers and use a mix of forward, fixed and formula pricing protocols, and our distribution centers purchase within the pricing guidelines and protocols we have established with the suppliers.

(Emphases added.)

54. In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2014 10-K contained signed certifications ("SOX Certifications") by defendants Ells, Moran and Hartung, stating that the financial information contained in the 2014 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed. The SOX Certifications set forth:

> I, [Steve Ells/ Montgomery F. Moran/ John R. Hartung], certify that:

1. I have reviewed this annual report on Form 10-K of Chipotle Mexican Grill, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

> registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.
>
> * * *
>
> In accordance with 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Steve Ells, the Founder, Chairman and Co-Chief Executive Officer of Chipotle Mexican Grill, Inc. (the "Registrant"), Montgomery F. Moran, the President and Co-Chief Executive Officer of the Registrant, and John R. Hartung, the Chief Financial Officer of the Registrant, each hereby certifies that, to the best of his knowledge:
>
> 1. The Registrant's Annual Report on Form 10-K for the year ended December 31, 2014, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and
>
> 2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition of the Registrant at the end of the period covered by the Periodic Report and results of operations of the Registrant for the periods covered by the Periodic Report.

55. On April 22, 2015, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 ("Q1 2015 10-Q"), signed by defendant Hartung. For the quarter, Defendants reported net income of $122.64 million, or $3.88 per diluted share, on revenue of $1.09 billion, compared to net income of $83.07 million, or $2.64 per diluted share, on revenue of $904.16 million for the same period in the prior year.

56. In addition, the Q1 2015 10-Q contained SOX Certifications, signed by defendants Ellis, Moran and Hartung, which were substantially similar to those set forth above.

57. On July 22, 2015, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 ("Q2 2015 10-Q"), signed by defendant Hartung. For the quarter, Management reported net income of $140.2 million, or $4.45 per diluted share, on revenue of $1.20 billion, compared to net income of $110.27 million, or $3.50 per diluted share, on revenue of $1.05 billion for the same period in the prior year. The Q2 2015 10-Q contained SOX Certifications, signed by Ellis, Moran and Hartung, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58. In addition, the Q2 2015 10-Q contained SOX Certifications, signed by defendants Ellis, Moran and Hartung, which were substantially similar to those set forth above.

59. During the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill. On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak. Health inspectors stated that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations. As a result of this news, between August 18 and September 4, 2015, Chipotle stock fell $26.29, or 3.6%, to close at $719.23 on September 4, 2015.

60. Between August 19, 2015 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota. On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations. The affected restaurants changed tomato suppliers but did not close. As a result of this news, between August 19, 2015 and September 17, 2015, Chipotle stock fell

$15.08, or approximately 2%, to close at $730.20 on September 17, 2015.

61. On October 21, 2015, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q3 2015 10-Q"), signed by defendant Hartung. For the quarter, Defendants reported net income of $144.88 million, or $4.59 per diluted share, on revenue of $1.22 billion, compared to net income of $130.80 million, or $4.15 per diluted share, on revenue of $1.08 billion for the same period in the prior year.

62. In addition, the Q3 2015 10-Q contained SOX Certifications, signed by defendants Ellis, Moran and Hartung, which were substantially similar to those set forth above.

63. On or around November 1, 2015, Defendants caused the Company to close all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of *E. coli* by Chipotle patrons.

64. On this news, Chipotle stock fell $16.23, or approximately 2.5%, to close at $24.00 on November 2, 2015.

65. On November 10, 2015, Defendants issued a press release addressing the restaurant closures in Portland and Seattle (the "November 2015 Press Release"). The November 2015 Press Release stated, in relevant part:

> Health officials have concluded that there is no ongoing risk from this incident. Chipotle has taken important steps to make certain that their food is as safe as it can be, including:
>
> - Conducting additional deep cleaning and sanitization in all its restaurants nationwide.
> - Replacing all ingredients in the closed restaurants.
> - Confirming that none of its employees in these restaurants had E. coli. Note: No Chipotle employees have had E. coli stemming from this incident.
> - Working with health officials to improve food handling procedures.

- Testing fresh produce, raw meat, and dairy items (cheese and sour cream) prior to restocking restaurants.

- Going above and beyond required testing, and enhancing nationwide testing of produce and fresh meat.

- Testing food, restaurant surfaces, and equipment in its restaurants (to date, Chipotle has received nearly 900 test results, all of which showed no E. coli).

- Implementing additional safety procedures, and audits, in all of its 2,000 restaurants to ensure that robust food safety standards are in place.

* * *

> "The safety of our customers and integrity of our food supply has always been our highest priority," said Steve Ells, chairman and co-CEO of Chipotle. "If there are any opportunities for us to do better in any facet of our sourcing or food handling – from the farms to our restaurants – we will find them. . . ."

66. Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts. On December 9, 2015, health officials confirmed that the students had contracted norovirus.

67. On this news, between December 1, 2015 and December 9, 2015, Chipotle stock fell $32.73, or roughly 5.6%, to close at $548.01 on December 9, 2015.

68. On December 4, 2015, Defendants caused the Company to file a current report on Form 8-K with the SEC, addressing the outbreak linked to its Brighton restaurant (the "December 2015 8-K"). The December 2015 8-K stated, in pertinent part:

> <u>Food Safety Commitment</u>
> As a restaurant company, ***nothing is more important to us than serving our guests food that is delicious and safe to eat***. Since this incident began, we have significantly increased our efforts to ensure that our teams are adhering to all of our food safety protocols, reassessed all facets of our food safety programs — from the farms that provide the ingredients we use, to the restaurants where we serve our customers — and made a number of improvements to help ensure that our food is as safe as it can be. Among the new or enhanced programs we have put in place include high-resolution testing where a series of DNA-based tests ensure the quality and safety of ingredients before they are shipped, end-of-shelf-life testing to be sure quality specifications are maintained throughout the shelf life of an ingredient, continuous improvement throughout our supply chain based

> on test results, and enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards. ***Collectively, we believe these changes will put us at the forefront of the restaurant industry in terms of food safety practices***. No Chipotle employees have been identified as having E. coli at any time during this incident, and we continue to serve more than 1 million customers on a daily basis.

(Emphasis added).

69. Throughout the Relevant Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations; (ii) Chipotle's quality controls were inadequate to safeguard consumer and employee health; and (iii) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

**C. <u>The Truth Begins to Emerge</u>**

70. On January 6, 2016, Defendants announced that in December 2015 the Company was served with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley. The DOJ Investigation is being led by the U.S. Attorney's Office for the Central District of California in conjunction with the FDA.

71. On this news, Chipotle stock fell $22.36, or 4.98%, to close at $426.67 on January 6, 2016.

72. According to press reports, an October 2015 memorandum by Ventura County, California environmental division officials noted that Chipotle first reported the outbreak on August 22, 2015 – after the Simi Valley store had already been closed and reopened as a result of complaints of foodborne illnesses. This protocol, of closing the restaurant location and

reopening before alerting authorities, was likely approved by Defendants and may have run afoul of state and/or federal laws and regulations.

73. On January 8, 2016, the Company became the subject of the *Ong* Securities Class Action in New York Federal Court.

74. On February 1, 2016, the CDC published its final report on the outbreak titled "Multistate Outbreaks of Shiga toxin-producing *Escherichia coli* O26 Infections Linked to Chipotle Mexican Grill Restaurants." The report stated, in relevant part:

- CDC, the U.S. Food and Drug Administration, the U.S. Department of Agriculture's Food Safety and Inspection Service, and public health officials in several states investigated two separate outbreaks of Shiga toxin-producing *Escherichia coli* O26 (STEC O26) infections.

- In the initial, larger outbreak, 55 people infected with the outbreak strain of STEC O26 were reported from 11 states. Twenty-one ill people were hospitalized.

- In the second, smaller outbreak, 5 people infected with a different strain of STEC O26 were reported from 3 states. One ill person was hospitalized.

* * *

- Investigators used whole genome sequencing (WGS), an advanced laboratory technique, to get more detailed information about the DNA fingerprints of the STEC O26 bacteria that caused illness.

- Isolates tested from ill people in the second, smaller outbreak were not related genetically to isolates from ill people in the initial, larger outbreak.

- The epidemiologic evidence collected during this investigation suggested that a common meal item or ingredient served at Chipotle Mexican Grill restaurants was a likely source of both outbreaks. The investigation did not identify a specific food or ingredient linked to illness.

75. In a Current Report on Form 8-K filed with the SEC on February 2, 2016, Defendants announced that the original criminal investigation had widened. Defendants reported that the Company received a second subpoena from the U.S. Attorney and that the new subpoena requires Chipotle to produce documents and information related to company-wide food safety

matters dating back to January 1, 2013. This new subpoena supersedes the previously served December 2015 subpoena, which was limited to a single Chipotle restaurant in Simi Valley, California.

76. Incredibly, Chipotle's quality controls are still not in compliance with applicable consumer and workplace safety regulations and are still inadequate to safeguard consumer and employee health. On July 18, 2017, media outlets reported that Chipotle had closed a restaurant in Sterling, Virginia due to a suspected norovirus outbreak. According to *Business Insider*, citing information from iwaspoisoned.com, a website on which consumers document suspected incidents of foodborne illness, at least 13 customers fell ill after eating at the Chipotle restaurant in question between July 14 and July 15.

77. The same week, there were reports of a rat infestation in a Chipotle restaurant located in Dallas, Texas. Video of the incident, which was posted by a customer on Facebook, showed "one rodent scurrying across the ground, another climbing the wall and a third limp on the ground at the restaurant" according to media reports.

78. On this news, Chipotle's share price fell $17.02, or 4.34%, to close at $374.98 on July 18, 2017.

79. On July 20, 2017, based on these new 2017 incidents, the *Kelley* Securities Class Action was filed in the Colorado Federal Court.

80. On July 26, 2017, the *NYT* reported that the Company was served another subpoena by U.S. federal prosecutors as part of an ongoing criminal investigation being conducted by the U.S. Attorney's office for the Central District of California into a spate of *E. Coli*, salmonella and norovirus outbreaks. The article stated, in relevant part:

> Chipotle Mexican Grill Inc said U.S. federal prosecutors served a subpoena, seeking information related to a suspected norovirus outbreak at a restaurant in Sterling, Virginia that it briefly closed last week.
>
> * * *
>
> The latest subpoena is part of an ongoing criminal investigation being conducted by the U.S. Attorney's office for the Central District of California into a spate of E. Coli, salmonella and norovirus outbreaks at the company's outlets in late 2015 that sickened more than 100 people across states.
>
> The July 19 subpoena is seeking information related to the incidents of illnesses associated with the Virginia restaurant, the company said in a filing.
>
> More than 100 diners had reported norovirus like symptoms on iwaspoisoned.com, a crowd-sourced website, after eating at the restaurant.

81. On this news, Chipotle's share price fell $14.30, or 4.04%, to close at $340.05 on July 26, 2017.

82. Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

83. Plaintiff brings this action derivatively in the right and for the benefit of Chipotle to redress the breaches of fiduciary duty and other violations of law by Defendants. Each preceding and subsequent paragraph is hereby incorporated by reference.

84. Plaintiff will adequately and fairly represent the interests of Chipotle and its shareholders in enforcing and prosecuting its rights, and has retained counsel competent and experienced in shareholder derivative litigation.

85. Plaintiff is and was an owner of Chipotle stock during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

86. On February 5, 2016, Plaintiff issued the Demand pursuant to Del. Ct. Ch. R. 23.1 on the Board to undertake an independent internal investigation into Defendants' violations of

Delaware and/or federal law, and to commence a civil action against each of the defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. *See* Exhibit A. The Demand stated in relevant part:

> … Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws.
>
> * * *
>
> … we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

87. On March 3, 2016, Plaintiff's counsel received the Acknowledgement from Blackburn of Messner Reeves, acting on behalf of the Board, acknowledging receipt of the Demand. *See* Exhibit B. The Acknowledgement requested proof of Plaintiff's ownership of Chipotle stock and the date Plaintiff first acquired stock in Chipotle.

88. Despite having no obligation to do so, and unaware of any Delaware authority upon which the Company relied on to make its request, Plaintiff's counsel provided the requested information and evidence of Plaintiff's ownership of Chipotle stock via letter dated April 13, 2016. *See* Exhibit C.

89. On July 21, 2016, Plaintiff's counsel received the DRC Letter, which informed Plaintiff's counsel that MNAT had been retained to represent the DRC that was charged with considering the Demand. *See* Exhibit D. The DRC Letter further stated that the DRC had elected to defer any investigation into the matters raised in the Demand ***until after*** the conclusion of the investigation being conducted by the U.S. Attorney's Office for the Central District of

California ***and*** the New York Federal Court's decision on the defendants' motion to dismiss in the *Ong* Securities Action.

90. At a bare minimum, the Board was duty-bound to investigate the allegations contained in the Demand upon receipt of the Demand. The DRC's decision to defer a consideration of the matters raised in the Demand -- serious, high-profile issues related to the Company's core operations and its only revenue stream -- would ultimately have serious consequences. The DRC's failure to investigate or take any action whatsoever in response to the Demand represents an abdication of its duty, and this failure is glaring in light of Chipotle's most recent, high-profile food safety incidents.

91. Accordingly, in light of the foregoing, the Board's refusal to act on the Demand is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and prosecute this action derivatively on behalf of the Company

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

92. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93. As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Chipotle disseminated accurate, truthful and complete information to its shareholders.

94. The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Chipotle shareholders materially misleading and inaccurate information about the Company's business relationship with Anthem, and the then-known yet concealed truth about its impact on the Company's financial performance and business operations through, inter alia, SEC filings and other public

statements and disclosures as detailed herein.

95. Specifically, the Individual Defendants had actual or constructive knowledge of the Company's failing food safety standards and failed to take corrective action. Thus, the Individual Defendants' actions could not have been a good faith exercise of prudent business judgment.

96. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

97. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS**

98. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99. As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's food safety procedures were properly implemented, and, when put on notice of problems with the Company's procedures, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

100. The Individual Defendants willfully ignored the obvious and pervasive problems with Chipotle' internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

101. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT**

102. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched through their compensation or other benefits at the expense of and to the detriment of Chipotle.

104. Plaintiff, as a shareholder and representative of Chipotle, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT IV**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

105. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106. The Individual Defendants had a duty to Chipotle and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Chipotle.

107. The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Chipotle in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Chipotle' affairs and in the use and preservation of Chipotle' assets.

108. During the course of the discharge of their duties, the Individual Defendants knew

or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Chipotle to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Chipotle, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged Chipotle.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Directing Chipotle to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 28, 2017

**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE PC**

*s/ Seth A. Katz*
SETH A. KATZ
MEGHAN C. QUINLIVAN
40 Inverness Drive East
Englewood, CO 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
Email: SKatz@burgsimpson.com
MQuinlivan@burgsimpson.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
E-mail: rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

**RM LAW, P.C.**
RICHARD A. MANISKAS
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com

*Counsel for Plaintiff*

## VERIFICATION

I, Mark D. Blau, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 7-26-2017

M. D. Blau

Mark D. Blau